Filed 10/4/21  In re G.M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.M. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E075957 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J285319, J285320, J285321, J285322) |
| v. | OPINION |
| C.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Rich Pfeiffer under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Dawn M. Martin, Deputy County Counsel, for Plaintiff and Respondent.

1

I.

INTRODUCTION

San Bernardino County Department of Children and Family Services (CFS) filed juvenile dependency petitions under Welfare and Institutions Code section 300[1] (Petition), on behalf of C.M.'s (Mother) four children, G.G. (born in 2016), A.M. (born in 2014), J.M. (born in 2012), and B.M. (born in 2008). The three oldest children (the older children) share the same biological father, D.C. (Father D.). G.G. has a different father, B.G. (Father B.). Following a contested jurisdiction and disposition hearing, the juvenile court found jurisdiction, ordered the children removed from Mother's physical custody, and awarded custody of the children to their respective fathers. The court terminated jurisdiction, dismissed the case, issued family law exit orders addressing custody and visitation (August 19, 2020 orders), and entered a final judgment (September 8, 2020 judgment). Mother appeals from the orders and judgment.

Mother contends there was insufficient evidence to support removal of the children from her. Mother also argues the juvenile court erred in ordering such limited visitation and failed to address sibling visitation. In addition, Mother argues the juvenile court should have construed her request for reconsideration of the August 19, 2020 orders as a petition for relief under section 388. We reject Mother's contentions and affirm the August 19, 2020 orders and September 8, 2020 judgment.

---

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

FACTS AND PROCEDURAL BACKGROUND

On March 8, 2020, CFS received a referral from the police that G.G. (then three and one-half years old) was being physically and sexually abused while in Mother's care. G.G.'s father, Father B., reportedly took G.G. to the hospital after discovering bruises on G.G.'s penis. G.G. told Father B. the bruises were from Mother making blue marks on his penis with a pencil. The police told the CFS social worker that G.G. appeared happy and active, with no visible marks or bruises.

A. *Detention*

On May 27, 2020, CFS received a second referral, alleging physical abuse, general neglect, and sexual abuse to G.G. The following day CFS obtained a detention warrant and detained the four children. G.G. was examined by a Children's Assessment Center (CAC) nurse practitioner (Ms. H.) who found non-patterned bruising on G.G.'s forehead and abrasions on his arm. During the exam, G.G. stated that Frank, his maternal step-grandfather (MGF), pushed him into a wall. G.G. also stated, "'my mom was drawing on me'" as he pointed to his penis. The CFS social worker reported that Ms. H. told her G.G. also stated, "'my mom was drawing on me'" as he pointed to his penis. Ms. H. advised the social worker that "there is a history of [G.G.] having bruising to his penis; [Ms. H.] stated she could not comment on said bruising at this time, as further assessment is needed."

On May 27, 2020, the social worker privately spoke to G.G. at Father B.'s home. When the social worker pointed to G.G.'s bruise on his forehead, G.G. said, "'Frank did it. He put me in wall harder.'" When asked about the bruise on the top of his head, G.G. said "'mommy . . . did it.'" During the interview, G.G. was in good spirits. Father B. told the social worker that almost every time G.G. returned to Father B.'s home, he had new marks and bruises. Father B. said Mother never had an explanation for the injuries.

The social worker privately interviewed the older children on May 27, 2020. They confirmed MGF lived in their home. A.M. stated Mother "'spanks us on the butt with her hand and she whoops me on the butt with a belt four (4) times.'" A.M. said Mother hit J.M. in the eye with the belt. J.M. and B.M. said maternal grandmother (MGM) and MGF constantly argued in the children's presence. B.M. denied Mother abused drugs or alcohol but said he witnessed MGF and an uncle smoke marijuana. The older children denied there was any sexual abuse.

MGF also denied G.G. was physically abused. MGF told the social worker that on May 24, 2020, G.G. had a tantrum. MGF grabbed G.G. by the hand and guided him to a wall for a time-out. G.G. resisted, lunged forward, and hit his forehead on the wall. MGF said he had been living with the family for over a month. He admitted having a history of using methamphetamine, cocaine, and marijuana. He stated he last used methamphetamine a month earlier.

Mother stated during her interview on May 27, 2020, that MGF no longer lived with her but he visited once or twice a week. She was aware of MGF's substance abuse

4

problem. The last time he abused a controlled substance was within the past month. Mother denied physically abusing the children. She disciplined them with time-outs and assigning the children additional chores. Mother said she did not know how G.G. obtained his marks and bruises.

On May 28, 2020, Mother was served with a detention warrant and the children were detained by CFS. She reported she was not currently married to Father B. or Father D. G.G. was transported to Father B.'s home, where he was placed under Family Maintenance. That same day, Father D., the father of the older children, A.M., J.M., and B.M., called CFS and said he lived in Las Vegas with his grandmother, uncle, cousin, and girlfriend. Father D. said he was on his way to California and requested the children released to him. Father D. stated he had been seeing the children regularly and last saw them two weeks ago. The older children were detained in foster care on May 28, 2020.

On June 1, 2020, CFS filed juvenile dependency petitions on behalf of each of the four children. The petition filed on behalf of G.G. was brought under section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (d) (sexual abuse). The petition alleged CAC examined G.G. and found that G.G. had sustained multiple injuries, including acute injury to his forehead, bruising on his penis, and abrasions on his upper right arm. CAC found the injuries consistent with non-accidental trauma, and they occurred while in Mother's care. The petition further alleged Mother and Father B. failed to protect G.G. and adequately care for him. The petition also alleged mother had sexually abused G.G. but those allegations were later stricken from the petition.

5

The petitions filed on behalf of the older children on June 1, 2020, alleged jurisdiction under section 300, subdivision (j) (abuse of sibling). The petitions alleged that Mother had physically and sexually abused the older children's sibling, G.G., and there was a substantial risk Mother would also abuse or neglect the older children. The sexual abuse allegations were later stricken from the older children's petitions.

In CFS's detention report, CFS reported that Mother had no criminal history in the county. Father B. had a 2008 conviction for driving without a license, and two convictions in 2011 for possession of a controlled substance. Father D. had a conviction in 2013 for battery. CFS further reported that there were no custody arrangements between Father D. and Mother regarding the older children. Father D. stated he had been visiting the older children for four hours twice a month in March, April, and May 2020. Before then, Father D. did not visit because Mother did not allow it, Father D. did not have reliable transportation, and he was financially unstable

Father D. said he was unemployed partly because of the pandemic but was receiving unemployment benefits. His relatives and live-in girlfriend were helping him financially. Father D. denied that he or anyone in his home had any mental illness, committed domestic violence, or abused drugs or alcohol. Father D. reported he had a great relationship with his children and communicated regularly with B.M. by phone. Father D. stated he wanted custody of the older children and wanted them to live with him in Las Vegas. CFS recommended the older children be returned to Father D.'s custody, pending a successful home assessment.

During the detention hearing on June 2, 2020, Mother objected to detaining the children but did not request a hearing. Mother acknowledged Father D. was the father of the older children, which was previously confirmed by a DNA test in a child support matter. The juvenile court gave CFS authority to place the older children with Father D., pending a positive home assessment. Mother also confirmed Father B. was G.G.'s father, and informed the court that there was a family court order granting him and Mother joint legal custody. The juvenile court ordered the children temporarily detained. MGF was ordered prohibited from having contact with G.G. G.G. was ordered to remain in Father B.'s custody.

CFS reported on June 4, 2020, that it completed a home assessment of Father D.'s home. Father D. lived with his girlfriend, grandmother, and uncle. CFS found the home appropriate and had no concerns regarding the older children living with Father D. CFS recommended the older children be returned to Father D.'s custody. At the continued contested detention hearing on June 4, 2020, Mother stated she was very concerned about being able to visit the older children if placed with Father D. in Las Vegas. The juvenile court ordered the children detained, with supervised visitation for Mother.

B. *Jurisdiction/Disposition Hearing*

CFS reported in its jurisdiction/disposition hearing report, filed on June 24, 2020, that CFS interviewed each of the children and their parents on June 19, 2020. During Mother's interview, she denied all of the petition allegations. She claimed G.G.'s head injury was from jumping on his bed and hitting his head. She said G.G. was an overly

7

active child and would fall out of bed. Mother claimed that since G.G.'s birth, Father B. had continually made allegations against her, which were unfounded. Mother noted every time G.G. was asked about sexual abuse, he was with Father B.

During Father B.'s interview, he stated he previously tried to get custody of G.G., made several CFS referrals, and requested welfare checks. He also tried to find out from Mother how G.G. got injured but Mother did not tell him. Father B. said he wanted custody of G.G. because he believed G.G. was not being supervised properly.

Father D. stated during his interview that he had no information about the sexual abuse allegations. The older children had not mentioned to him wanting to visit Mother, other than A.M. stating she missed Mother. Father D. was concerned about B.M.'s well-being because Mother had locked him out of the house for losing the house key, and Mother had made him act as the other children's guardian, without allowing B.M. to be a child. Father D. also believed Mother inaccurately portrayed Father D. as not wanting to be with the children. When Father D. attempted to spend time with them, Mother only permitted him to see them in her home. Father D. reported he had a 2013 misdemeanor conviction for domestic violence. The offense involved holding down Mother while she was yelling at him. He said he did not know this was inappropriate.

During B.M.'s interview, he denied there was any physical or sexual abuse. B.M. said his family had problems, including people in their home using drugs. B.M. stated that G.G.'s bruises were from G.G. playing rough. B.M. denied MGF did anything to G.G. B.M. reported that CFS was involved because Father B. would call CPS a lot.

8

B.M. said he did not get in trouble but J.M. and A.M. would get "smacked," and Mother and MGF used to physically discipline G.G. B.M. said he supervised the other children but did not like to because he did not get the chance to do what he wanted to do. B.M. did not like MGF because he fought with MGM for no reason and would cause problems. The police were always showing up because of MGF. B.M. told CFS he felt safe living with Father D., but also felt safe at Mother's home and enjoyed living with her. He lamented that he had plans and then suddenly his life changed. B.M. added that he currently enjoyed living with Father D. and liked Father D.'s girlfriend, but would like to visit Mother.

During J.M.'s interview, he denied any physical or sexual abuse in the home. He said G.G.'s injuries were from playing and bumping into things. J.M. stated he was not afraid of living with Mother, but enjoyed living with Father D. and felt safe. A.M. stated during her interview that there was no physical or sexual abuse. G.G. was injured when he tried to run and fell down. A.M. stated Mother "'would only hurt us only when we were bad.'" Sometimes Mother would use a hanger or her hand to discipline the children or "'whooped'" them on the head but it did not hurt. A.M. did not like MGF because he was always beating up MGM and her uncle helped him beat her.

G.G. stated during his interview that Mother "'beat me up all the time over and over'" and spanked him on the buttocks repeatedly. She also drew on his penis with a pen three times. G.G. said that MGF also hurt him and "'put me harder on the wall.'"

9

CFS attached to the jurisdiction/disposition hearing report, CAC's report of G.G.'s physical and sexual abuse medical exam on May 27, 2020. The medical exam findings included a bruise on G.G.'s forehead, bruises on his right upper arm, a bruise on his right mid-arm, abrasions on his left knee, and two scars on his forehead. The arm bruises reportedly were consistent with a squeeze/grab mark. The scars and abrasions reportedly could have been caused intentionally or accidentally. CFS reported G.G.'s penis and arm bruising were consistent with physical abuse, as concluded in the CAC report.

Also attached to the jurisdiction/disposition hearing report were a police report of the sexual assault allegation on March 8, 2020, and a police report of Father B.'s concerns regarding G.G.'s well-being. There was also a report of G.G.'s unexplained bruising on May 6, 2019. In addition, CFS provided family law court hearing reports regarding Father B. and Mother's custody of G.G. During a family law court custody modification hearing on January 9, 2019, Father B. reported concerns regarding G.G.'s marks and bruises, and Mother's ability to parent.

CFS concluded in its jurisdiction/disposition hearing report that there was sufficient evidence to support the allegations Mother had sexually and physically abused G.G. CFS also concluded there was sufficient evidence to support findings Father B. failed to protect him. CFS noted the CAC report indicated G.G.'s injuries were most consistent with physical abuse. The older children did not report concerns of physical or sexual abuse but disclosed physical discipline by Mother and a family friend, referred to as an uncle, who lived with Mother. CFS reported Mother was cooperative with CFS,

10

was willing to engage in services, made an effort to participate in services, and had a deep bond with the children. However, because Mother failed to provide a reasonable and consistent explanation as to how G.G. sustained multiple injuries, her ability to properly supervise and protect the children was in question. CFS concluded Mother needed additional services to learn how to provide a safe environment for the children.

CFS further stated it had no concerns regarding the children's fathers ability to parent the children and ensure their safety. Both fathers demonstrated a bond with their children, had taken necessary measures to ensure their well-being, and had cooperated with CFS. CFS therefore concluded it would be detrimental to place the children with Mother, and it was necessary to remove them from her. CFS recommended physical custody of the children be given to their respective fathers, and dependency jurisdiction be terminated.

During the contested jurisdiction/disposition hearing on August 19, 2020, the court initially noted there did not appear to be sufficient evidence to support the sexual abuse allegation. Mother then testified. She stated her relationship with the children was loving but chaotic. The children were rambunctious when playing. The boys enjoyed wrestling and rough-housing, resulting in G.G. sustaining injuries every week. Mother was going to counseling to learn how to discipline the children without using corporal punishment. After Mother testified, minors' counsel noted G.G.'s penis injury appeared to be more consistent with physical abuse than sexual abuse. The court dismissed the sexual abuse count and the allegation Father B. failed to protect G.G. from sexual abuse.

11

After hearing Mother's testimony and oral argument, the court sustained the allegation G.G.'s injuries were non-accidental and occurred during Mother's care. The court further found by clear and convincing evidence that the petition allegations, as amended by striking the sexual abuse allegations, were true.

As to the disposition, the minors' counsel stated the children missed Mother but counsel had no objection to terminating jurisdiction because the children's fathers were meeting their needs. Mother's counsel stated she was willing to drive to Nevada to see the older children every week and did not want the court to terminate jurisdiction. The court nevertheless ordered custody of the children removed from Mother, awarded custody of the children to their respective fathers, terminated dependency jurisdiction, and dismissed the petition. The court also entered a family court exit order, granting Mother telephone contact with the children at least once a week. Because Mother had not yet completed parenting classes or individual counseling, the court ordered supervised visitation with the children once a week for two hours.

After entry of the custody orders and judgment of dismissal of the juvenile dependency case on September 8, 2020, Mother, in propria persona, sent the juvenile court a letter filed on October 15, 2020, requesting the court to reconsider its custody and dismissal orders entered on August 19, 2020. The juvenile court deemed the letter a notice of appeal and served the parties with a clerk's notification of Mother filing a notice of appeal.

12

III.

SUFFICIENCY OF EVIDENCE TO SUPPORT DISPOSITION

Mother contends there was insufficient evidence to support the disposition order removing the children from her custody.

At a disposition hearing removing a child from parents, "the court's findings must be made on clear and convincing evidence. The court must find that [1] the welfare of the child requires that she be removed from parental custody because of a substantial danger . . . to her physical health if she is returned home and [2] that there are no reasonable means to protect her without removing her. (§ 361, subd. (b)(1), Cal. Rules of Court, rule 1456(c).)" (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654; § 361, subd. (c)(1), Cal. Rules of Court, rule 5.695(c).[2]) "The high standard of proof by which this finding must be made is an essential aspect of the presumptive, constitutional right of parents to care for their children. [Citations.]" (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.) However, "[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136 (*T.V.*).)

"'[O]n appeal, the substantial evidence test is the appropriate standard of review. Thus, in assessing this assignment of error, "the substantial evidence test applies to determine the existence of the clear and convincing standard of proof . . . ." [Citation.]'

---

[2] Undesignated rule references are to the California Rules of Court.

[Citation.]" (*In re Henry V.*, *supra*, 119 Cal.App.4th at p. 529.) "We accept the court's factual findings and all reasonable inferences supporting them." (*Id*. at p. 530)

A. *Risk of Harm*

CFS cites *T.V.*, *supra*, 217 Cal.App.4th 126, for the proposition the juvenile court's physical abuse jurisdictional findings are prima facie evidence the children could not safely remain in Mother's home. We disagree. (*In re E.E.* (2020) 49 Cal.App.5th 195, 217-219 (*E.E.*).) *T.V.* relies on section 361, subdivision (c)(1) and *In re Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*), in support of the proposition "[t]he jurisdictional findings are prima facie evidence the minor cannot safely remain in the home." (*T.V.*, *supra*, at p. 135.) The cited authority *T.V.* relies on does not support this proposition. (*E.E*, *supra*, at pp. 218-219.)

Section 361, subdivision (c)(1) provides that jurisdictional findings are prima facie evidence a child cannot safely remain in the home *only* when jurisdiction is based on a *section 300, subdivision (e)* finding. (*E.E.*, *supra*, 49 Cal.App.5th at p. 219 ["The statutory presumption in favor of removal applies only when the child has been adjudicated a dependent under section 300, subdivision (e)."].) Section 361, subdivision (c)(1) states that "[t]he fact that a minor has been *adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300* shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent . . . with whom the minor resided at the time of injury." (Italics added.)

14

Neither *T.V.* nor *Cole C.*, *supra*, 174 Cal.App.4th 900 involved jurisdiction findings based on section 300, subdivision (e).[3] At the jurisdiction/disposition hearing in *T.V.*, the juvenile court sustained the juvenile dependency petition allegations under section 300, *subdivision (b)* (failure to protect), declared the child a dependent, removed her from parental custody under section 361, subdivision (c)(1), and placed her with a relative. (*T.V.*, *supra*, 217 Cal.App.4th at p. 131.)

In *Cole C.,* at the jurisdiction/disposition hearing, the juvenile court declared the child a dependent of the juvenile court under section 300, *subdivision (j)* (sibling abuse), ordered him removed from his father's custody under section 361, subdivision (c)(1), and ordered the child placed with his mother. (*Cole C.*, *supra*, 174 Cal.App.4th at pp. 904, 909.) Section 300, subdivision (j) provides that a child is within the juvenile court's jurisdiction if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." In *Cole C.*, the juvenile court

---

[3] Section 300, subdivision (e) provides in relevant part: "(e) The child is *under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent*, if the parent knew or reasonably should have known that the person was physically abusing the child. For the purposes of this subdivision, '*severe physical abuse*' means any of the following: any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; any single act of sexual abuse which causes significant bleeding, deep bruising, or significant external or internal swelling; or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness; or the willful, prolonged failure to provide adequate food." (Italics added.)

15

found jurisdiction over the child's siblings under section 300, subdivision (b). There was no jurisdiction finding under subdivision (e).

In the instant case, jurisdiction was declared under section 300, *subdivisions (a)* (serious physical harm), *(b)* (failure to protect), and *(j)* (sibling abuse). Jurisdiction over G.G.'s siblings was based on subdivisions (a) and (b) of section 300. There was no finding under section 300, subdivision (e), no doubt in part because the three older children were not under the age of five. Therefore, there was no basis for concluding the jurisdiction findings in *T.V.*, *supra*, 217 Cal.App.4th 126, *Cole C.*, *supra*, 174 Cal.App.4th 900, or the instant case provided prima facie evidence under section 361, subdivision (c)(1), that the minors could not safely remain in the home. (*E.E.*, *supra*, 49 Cal.App.5th at p. 219.)

Nevertheless, there was more than sufficient evidence to support the juvenile court's finding there was a substantial danger, or risk of harm, to the children if returned to Mother's home. Therefore the welfare of the children required their removal from Mother's custody. Mother does not challenge on appeal the jurisdictional findings. Instead, she argues there was insufficient evidence the children were at a serious risk of harm if they were returned to her. But there was substantial evidence demonstrating Mother had failed to adequately supervise and protect the children. Such evidence showed that G.G. sustained multiple unexplained injuries while in Mother's care. G.G.'s injuries included bruising to his penis, arms, and forehead, scarring, and abrasions, which

were deemed consistent with physical abuse. There was also evidence Mother used inappropriate physical discipline.

Such evidence included a CFS referral on March 8, 2020, from the police that G.G. was being physically and sexually abused. G.G.'s father, Father B., reportedly took G.G. to the hospital after discovering bruises on G.G.'s penis. G.G. told Father B. the bruises were from Mother making blue marks on his penis with a pencil. On May 27, 2020, CFS received a second referral, alleging physical abuse, general neglect, and sexual abuse to G.G. The CAC nurse practitioner examined G.G. and found non-patterned bruising on G.G.'s forehead and abrasions on his arm. During the exam, G.G. told the nurse practitioner that MGF pushed him into a wall. G.G. also stated, "'my mom was drawing on me'" as he pointed to his penis. The nurse practitioner reported that there was a history of G.G. having bruising on his penis.

G.G.'s CAC medical exam findings reportedly included a bruise on G.G.'s forehead, bruises on his right upper arm, a bruise on his right mid-arm and forehead, abrasions on his left knee, and two scars on his forehead. The arm bruises reportedly were consistent with a squeeze/grab mark. CAC also found that G.G.'s scars and abrasions could have been caused intentionally or accidentally. CFS reported G.G.'s penis and arm bruising were consistent with physical abuse, as concluded in the CAC report.

CFS's interviews of the children and their parents and grandparents on May 27, 2020, and June 19, 2020, provided additional evidence of physical abuse. When the CFS

17

social worker pointed to G.G.'s bruise on his forehead, G.G. said, "'Frank did it. He put me in wall harder.'" When asked about the bruise on the top of his head, G.G. said "'mommy . . . did it.'" During G.G.'s interview on June 19, 2020, G.G. stated that Mother "'beat me up all the time over and over,'" spanked him on the buttocks repeatedly, and drew on his penis with a pen three times. G.G. said that MGF also hurt him and "'put me harder on the wall.'"

A.M. stated during her interview on May 27, 2020, that Mother "'spanks us on the butt with her hand and she whoops me on the butt with a belt four (4) times.'" A.M. mentioned Mother hit J.M. in the eye with a belt. During A.M.'s interview on June 19, 2020, A.M. said Mother "'would only hurt us only when we were bad.'" A.M. added that sometimes Mother would use a hanger or her hand to discipline the children but claimed it did not hurt. A.M. said that when they got in trouble, Mother "'whooped'" them on the head but it did not hurt. A.M. added that she did not like MGF because he was always beating up MGM and her uncle helped him beat her.

During B.M.'s interview on June 19, 2020, B.M. said his family had problems, including people in their home using drugs. B.M. stated that G.G.'s bruises were from playing rough. B.M. noted that he did not get in trouble but J.M. and A.M. would get "smacked." B.M. said Mother and MGF used to physically discipline G.G. but recently stopped. B.M. further stated he had to supervise the other children.

During Father B.'s interview on May 27, 2020, Father B. told the social worker that almost every time G.G. returned to Father B.'s home, he had new marks and bruises.

18

Father B. said Mother never had an explanation for the injuries. During a family law court custody modification hearing in January 2019, Father B. reported concerns regarding G.G.'s marks and bruises, and Mother's ability to parent. During his June 19, 2020 interview, Father B. said he tried to find out from Mother how G.G. got injured but Mother did not tell him. Father B. added that he wanted custody of G.G. because he believed G.G. was not being supervised properly.

During Mother's testimony and interviews, she provided questionable and inconsistent explanations for G.G.'s injuries. She said G.G. was an overly active child, threw temper tantrums, and was injured possibly from rough-housing. Mother also acknowledged using corporal punishment, but said she was receiving counseling to learn to use other punishment methods.

The foregoing summarized evidence is more than sufficient to support the juvenile court's finding that the welfare of the children required their removal from Mother's custody because of substantial danger to their physical health if returned to her. (§ 361, subd. (c)(1).)

B. *No Reasonable Alternatives to Removal*

Removal under section 361, subdivision (c)(1) requires not only a risk of harm to a child if not removed, but also clear and convincing evidence there are no reasonable means by which the child's physical health can be protected without removing the child.

Mother argues the court erred by not considering less drastic disposition alternatives, such as CFS providing supervision of the children while with Mother and

19

prolonging jurisdiction to allow her additional time to reunite with them. She asserts she was not provided sufficient time to complete her case plan and reunify with them. Although the court was required to consider alternatives to removal from the custodial parent, here, removal was appropriate because there was clear and convincing evidence there was or would be a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being if they were returned to Mother's care, and there were no reasonable means by which they could be protected without removing them from Mother's physical custody. (§ 361, subd. (c)(1).)

Substantial evidence shows that the children would not be safe unsupervised in Mother's care until she took responsibility for G.G.'s injuries, learned appropriate parenting skills, and was forthright regarding the actual causes of G.G.'s injuries. This was why all visits were required to be supervised. Furthermore, even if Mother was provided with supervised visits and eventually succeeded in learning appropriate methods of supervising, protecting, and disciplining her children and ceased minimizing the issues leading to the children's removal, this would likely take time while, in the meantime, the children were happily living with their fathers. Removal of the children from Mother was therefore proper because substantial evidence demonstrated there were no reasonable alternatives.

20

## IV.

## TERMINATION OF DEPENDENCY JURISDICTION

Mother contends the juvenile court erred in terminating the juvenile dependency proceedings after ordering the children removed from her and placed with their respective fathers under section 361.2, subdivision (a). We disagree.

Section 361.2, subdivision (a) describes the juvenile court's discretion when it places a dependent child with a formerly noncustodial parent. (*In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1495.) Under section 361.2, subdivision (a), "[w]hen a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

"[U]nder section 361.2, subdivision (a), the court examines whether it would be detrimental to temporarily place a child with the nonoffending noncustodial parent; under subdivision (b), the court decides whether that placement should be permanent and whether the court's jurisdiction should be terminated." (*In re A.A.* (2012) 203 Cal.App.4th 597, 605.) "A nonoffending parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be detrimental to the safety,

protection, or physical or emotional well-being of the child." (*In re A.A.* (2012) 203 Cal.App.4th 597, 605.)

Mother does not object to the temporary placement of the children with their fathers. Rather, she objects to the juvenile court awarding the fathers custody and terminating dependency jurisdiction, rather than continuing her services and dependency jurisdiction. But the juvenile court was authorized to terminate jurisdiction and award the fathers custody under section 361.2, subdivision (b), which provides in relevant part that, "[i]f the court places the child with that parent, the court may . . . [¶] [o]rder that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child."

Here, the juvenile court appropriately placed the children with their fathers under section 361.2, subdivision (a), and there was no abuse of discretion in terminating dependency jurisdiction and awarding the fathers custody under section 361.2, subdivision (b). The children's fathers triggered application of section 361.2, subdivision (a) placement by requesting custody at the inception of the juvenile dependency proceedings. In addition, G.G.'s father, Father B., had consistently demonstrated concern for G.G.'s well-being, long before the juvenile dependency proceedings. Father B., had repeatedly expressed concern about G.G.'s frequent injuries while in Mother's care. He reported his concerns to medical providers and law enforcement. Father B. already shared joint legal custody of G.G., with a time-share order allowing G.G. to be with

Father B. three days a week under a 2017 family law custody court order. There was no evidence there had been any concerns regarding Father B.'s time-sharing or ability to care for G.G.

CFS reported that both fathers had maintained close relationships with their children and confirmed the fathers were providing appropriate, safe, loving homes for their children. CFS further reported at the time of the jurisdiction/disposition hearing that the children had been living with their fathers for several months and, although they indicated they missed Mother, they were happy living with their fathers.

Mother argues evidence was presented raising concerns about the fathers' past conduct, ability to care for the children, and interference with her relationship with the children. However, there was also evidence supporting the juvenile court's findings the children were safe and happy in their fathers' care, whereas Mother required supervised visits because she had physically abused G.G., and she had not completed her parenting classes or individual counseling. The court also found that the fathers were not in need of any further treatment or rehabilitation. The court further noted that both Mother and the fathers had a problem interreacting with each other and needed to try to find a way to co-parent. Otherwise, their failure to do so would negatively affect the children.

The court was not required to wait for Mother to complete her services before terminating jurisdiction, and Mother had not demonstrated that awarding the fathers custody would be detrimental to the safety, protection, or physical or emotional well-being of the children. Under section 361.2, the court's primary focus is on the well-being

23

of the children. (*In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1497 ["section 361.2, subdivision (a), appears to grant the juvenile court wide discretion to advance the minor's best interests"].) We therefore conclude that, under section 361.2, subdivision (a), the juvenile court did not abuse its discretion in terminating dependency jurisdiction and awarding custody of the children to their respective fathers.

V.

SIBLING VISITATION

Mother contends the trial court erred in limiting Mother's visitation and not addressing sibling visitation. We disagree.

"When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation. [Citations.] Such orders become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court. [Citation.]" (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122-1123.)

Rule 5.695 (a)(7) states in relevant part that at the disposition hearing, the court may "(7) Declare dependency, remove physical custody from the parent . . . and: [¶] (A) After stating on the record or in writing the factual basis for the order, order custody to a noncustodial parent, terminate jurisdiction, and direct that *Custody Order--Juvenile-- Final Judgment* (form JV-200) be prepared and filed under rule 5.700," which is what the court did in the instant case.

The juvenile court's power under section 362.4 to make custody and visitation exit orders requires it "to make an informed decision concerning the best interests of the child." (*In re John W.* (1996) 41 Cal.App.4th 961, 972.) We apply the abuse of discretion standard of review when considering objections to a visitation orders. (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1119 ["Visitation order in dependency cases are typically reviewed for abuse of discretion and will not be reversed absent a 'clear showing of an abuse of discretion.'"].)

During the jurisdiction/disposition hearing on August 19, 2020, the court ordered physical custody removed from Mother and given to the children's fathers, with weekly supervised visitation ordered for Mother. The court also ordered weekly phone contact. There was no discussion or consideration of visitation between the children. On September 8, 2020, the court entered form JV-200 custody orders and judgments for the children's custody and visitation, as stated during the jurisdiction/disposition hearing on August 19, 2020.

Mother asserts that frequent visitation with her was in the children's best interests, and the children's desires should be a dominant factor in crafting the visitation order. Mother notes that CFS reported, and the children's attorney informed the court, that they missed her and wanted visits with her. During the disposition hearing, Mother's attorney requested the proposed visitation schedule for the older children changed from twice a month to every week for two hours. The court agreed to make the change. Mother also objected to supervised phone calls only once a week. The court agreed not to order any

limit on calls and ordered that Mother was to be guaranteed at least one call per week, with no required supervision of calls with the older children. As to G.G., Mother did not object to the proposed visitation order.

Mother speculates that had the juvenile court permitted her to visit the older children more often during the pending juvenile dependency case, the outcome would have been different in that she would have received shared physical custody. She alternatively suggests that, even if the outcome were not different, it is likely her exit order for visitation would have been greater if the visitation during the pendency of the juvenile dependency case had not been limited to two hours a week for the older children. This also is highly speculative.

Mother has not cited any legal authority supporting her objection either to the pre-disposition visitation order or the exit visitation order, allowing Mother to visit the older children once a week for two hours. In any event, Mother has not shown she suffered prejudice. She has not demonstrated that, had there been more frequent pre-disposition visitation, the outcome would have been any different. Mother simply speculates. Consequently, if there was any deficiency in the pre-disposition visitation order, it constitutes harmless error. (*In re Jesusa V.* (2004) 32 Cal.4th 588, 625.)

As to the exit order regarding visitation with the older children, the court changed the order, as requested by Mother, and she did not object to the revised order. She thus forfeited any objection to the order. (*Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1117 [an appellant forfeits claims of error through inaction that prevents the trial

26

court from avoiding or curing the error]; *In re Cynthia C.* (1997) 58 Cal.App.4th 1479, 1484, fn. 5 ["a party is precluded from urging on appeal a point not raised in the trial court"]; *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 ["[a]lthough the loss of the right to challenge a ruling on appeal because of the failure to object in the trial court is often referred to as a 'waiver,' *the correct legal term for the loss of a right based on failure to timely assert it is 'forfeiture,'* because a person who fails to preserve a claim forfeits that claim."].)  Furthermore, Mother has not demonstrated that more frequent visitation was in the children's best interests, particularly when the court also granted Mother unlimited contact by telephone and supervised visitation was required.  (*In re John W.*, *supra*, 41 Cal.App.4th at p. 972.)

Mother further argues the juvenile court failed to address sibling visitation. Mother asserts no efforts were made by CFS, the children's attorney, or the court to maintain sibling contact.  Mother cites section 16002 for the proposition it reflects the legislative policy of maintaining the continuity of the family unit by placing siblings together when removed from their homes.  (§ 16002, subds. (a) and (b).)  When this is not possible, section 16002 states that "a diligent effort shall be made, and a case plan prepared, to provide for ongoing and frequent interaction among siblings until family reunification is achieved, or, if parental rights are terminated, as part of developing the permanent plan for the child."  (§ 16002, subd. (b).)

But sections 16000 and 16002 do not apply here, where the children were placed in the custody of their own fathers.  In addition, the statutes set forth legislative priorities

27

for discretionary placement, not mandatory duties where jurisdiction is terminated. (*County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 641-642.) "[P]lacement with siblings is a legislative goal that does not create a mandatory duty. It is a factor to be considered in making the *discretionary foster care placement*. Moreover, its purpose is to preserve familial relationships . . . ." (*Id*. at p. 642, italics added.)

Here, as discussed above, the juvenile court properly removed the children from Mother's physical custody and appropriately gave physical custody to the children's respective fathers. Because G.G. and the older children have different fathers, this resulted in separation of G.G. from the older children. Mother asserts the juvenile court erred in failing to facilitate ongoing sibling contact and did not make any findings that sibling contact was contrary to the safety or well-being of the child.

The record demonstrates that visitation between G.G. and the older children would have been logistically problematic because the older children were living with their father in Las Vegas and Mother was driving there weekly, for two-hour visits. G.G. was three years old. The juvenile court therefore likely would have reasonably concluded that regular visitation between G.G. and the older children was contrary to the safety and well-being of G.G. and the older children, because it would have required them to travel long distances. In addition, the record does not show that the children were prevented from contacting each other by telephone. Under such circumstances, we conclude the absence of any arrangements to facilitate the children regularly interacting with each other does not constitute prejudicial error. (*In re Jesusa V.*, *supra*, 32 Cal.4th at p. 625.)

Furthermore, Mother did not request the court to order measures facilitating ongoing contact between the sibling groups. She therefore forfeited any objection on appeal. (*Steven W. v. Matthew S.*, *supra*, 33 Cal.App.4th at p. 1117; *In re Cynthia C.*, *supra*, 58 Cal.App.4th at p. 1484, fn. 5; *In re S.B.*, *supra*, 32 Cal.4th at p. 1293, fn. 2.)

VI.

RECONSIDERATION OF ORDER TERMINATING JURISDICTION

Mother contends the juvenile court should have treated her letter to the juvenile court, requesting reconsideration of the August 19, 2020 order as a petition for relief under section 388. Instead, the court deemed the in pro per letter a notice of appeal. Without citing any supporting legal authority, Mother argues that the juvenile court had authority to set aside the August 19, 2020 order under section 388.

After entry of the custody orders and judgment of dismissal of the juvenile dependency case on September 8, 2020, Mother sent the juvenile court a letter filed on October 15, 2020, requesting the court to reconsider its custody and dismissal orders entered on August 19, 2020. Mother stated she had no way of explaining G.G.'s injuries but suggested possible causes. Mother further objected to the juvenile court terminating jurisdiction before she had an opportunity to complete her parenting classes and therapy. Mother informed the court that, after the case was dismissed, she completed therapy on September 14, 2020, and parenting classes on October 13, 2020. She therefore requested the juvenile court to reconsider the August 19, 2020 order removing the children from her and granting physical custody to their respective fathers. Upon receiving Mother's letter

29

requesting reconsideration, the juvenile court deemed the letter a notice of appeal and served the parties with notice of the instant appeal of the August 19, 2020 orders and judgment of dismissal.

Mother argues that under rule 5.570(a), a petition for modification shall be liberally construed in favor of its sufficiency. But Mother did not file a petition for modification and her letter does not meet the requirements of such a petition under section 388 or rule 5.570. Furthermore, when Mother's letter was filed on October 15, 2020, judgment had already been entered on September 8, 2020, with the juvenile dependency court's jurisdiction terminated and jurisdiction transferred to the superior court, family law division under sections 302, subdivision (d)[4] and 361.2, subdivision (b)(1).[5] The juvenile court therefore did not err in deeming Mother's letter for reconsideration a notice of appeal, because the juvenile court no longer had jurisdiction to modify its August 19, 2020 orders or judgment.

---

[4] Section 302, subdivision (d) states in relevant part: "Any custody or visitation order issued by the juvenile court at the time the juvenile court terminates its jurisdiction pursuant to [s]ection 362.4 regarding a child who has been previously adjudged to be a dependent child of the juvenile court shall be a final judgment and shall remain in effect after that jurisdiction is terminated."

[5] Section 361.2, subdivision (b)(1) states: "(b) If the court places the child with [the noncustodial] parent, the court may . . . (1) Order that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents."

## VII.

## DISPOSITION

The August 19, 2020 orders and September 8, 2020 judgment are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON _____

J.

We concur:

MILLER _____
       Acting P. J.

MENETREZ _____
       J.